342 So.2d 306 (1977)
Willie B. THOMPSON, Jr.
v.
STATE of Mississippi.
No. 49303.
Supreme Court of Mississippi.
February 9, 1977.
Dale & Upton, Garland D. Upton, Columbia, for appellant.
A.F. Summer, Atty. Gen., by Vera Madel Speakes, Sp. Asst. Atty. Gen., and Karen A. Gilfoy, Asst. Atty. Gen., Jackson, for appellee.
Before PATTERSON, SUGG and WALKER, JJ.
SUGG, Justice, for the Court:
Defendant, Willie B. Thompson, Jr., was convicted of murder and sentenced to life imprisonment by the Marion County Circuit Court. After his indictment and before trial defendant was sent to the Mississippi State Hospital at Whitfield for a pre-trial examination to determine his mental competence. While at Mississippi State Hospital, he was referred to a physician for a cardiovascular examination whose report stated: "I would gain the impression that he might be slightly retarded."
*307 Defendant was examined by the staff at Mississippi State Hospital and the conclusion of the staff was reported by Donald C. Guild, M.D., Director of Forensic Psychiatry, as follows:
Mr. Willie B. Thompson, Jr. is a nineteen year old black male who was admitted to the maximum security unit at the State Hospital for evaluation and/or treatment with the charge of murder pending.
Mr. Thompson was seen by the full forensic staff on December 3, 1975 and his case was extensively discussed.
The staff voted to diagnose him Borderline Mental Retardation and felt that he was competent and responsible.
Mr. Thompson will be returned to the jurisdiction of the court.
The first question is whether the defendant understood his waiver of constitutional rights.
At defendant's trial the state offered in evidence a confession signed by the defendant. Defendant's attorney objected in this language: "We would object to its receipt into evidence on the main basis, that is, as to the voluntariness of it." Following the objection a hearing was held outside the presence of the jury. M.S. Magee, an investigator for the Mississippi Highway Patrol, identified a waiver of rights signed by this defendant at 3:00 p.m. on January 23, 1975 and his confession signed at 3:55 p.m. on the same date. Defendant testified that he did not know what his rights were and did not understand that he was entitled to an attorney, that he did not have to answer questions, that an attorney would be appointed for him before questioning if he desired, that he was entitled to have an attorney present during his interrogation, that any statement he made could be used against him in court, or that he could stop the questioning at any time. At his trial he said he understood his rights because his attorney had explained his rights to him. This is a strong indication that he had the mental capacity to understandingly waive his constitutional rights.
He also testified that one of the officers told him that if he would tell the truth they would help him in court. He said that none of the officers threatened him in any way. He said that he had a drivers license, having secured the same without taking a written examination, and had worked the last two years as a carpenter and on weekends as a filling station attendant. His duties included putting gasoline in vehicles, handling money and making change. He also testified about previous employment of hauling pulpwood and working at a "lumber place" where his duties consisted of stacking lumber and loading merchandise for customers. He had completed the eighth grade in school.
Following defendant's testimony Magee denied that any of the officers offered to help defendant with the court if he would confess and stated that he thought defendant understood his rights as they were explained to him before the confession was made. During the questioning of defendant four officers were in the room at all times and two other officers were in the room part of the time. All of the officers were called and substantiated the testimony of the witness Magee. The evidence also showed that, after the confession was typed, a correction was made in the confession by the defendant who initialed the correction.
Following this testimony defense counsel renewed his objection to the introduction of the confession in the following language:
We now renew our objection and would observe to the Court that the testimony of this witness demonstrates conclusively that he lacks sufficient comprehension of the written and spoken language to know the difference between voluntariness and involuntariness and therefore renders any statement he signed involuntary as a matter of law.
The objection was overruled and the same testimony was then presented in the presence of the jury. Defendant was permitted to testify before the jury for the limited purpose of showing that he did not understand the waiver and that the officers *308 had agreed to help him if he would give a statement.
We stated in Harvey v. State, 207 So.2d 108 (Miss. 1968) that the state must show beyond a reasonable doubt that a confession of crime was made voluntarily before it may be introduced in evidence. We also observed that the general rule is that a confession of an insane person cannot be admitted because he cannot waive his constitutional rights against self incrimination. We further held that a defendant should offer proof of his incapacity at the time the state offers confession in evidence in the absence of the jury.
The confession of Harvey, an eighteen year old, who was shown to function at the level of an eight to twelve year old but whose ability to function decreased when he was upset, was admitted by the trial court, but we held the admission of the confession was error. There was testimony from experts that Harvey had an intelligence quotient of 60 and was suffering from brain disfunction or brain damage. Harvey had passed the eighth grade; however, his teacher testified that he was not capable of passing but was passed socially but not academically. Lay witnesses testified that he would crawl through windows when he visited them and that he usually had a pack of "alley dogs" following him.
Similarly in Dover v. State, 227 So.2d 296 (Miss. 1969), we held that Dover's confession was not voluntary beyond a reasonable doubt. Two of Dover's brothers, his father and a sister testified that Dover was below normal in intelligence, was unable to read and write, was unable to progress beyond the second grade in school, was 45 years of age and, although he lived alone, they constantly saw to his needs. They admitted Dover owned and operated a truck but he had no drivers license. Experts testified that Dover had an intelligence quotient of 60 and was diagnosed as having moderate mental retardation or moderate mental defective range.
Unlike the facts in Harvey and Dover, there is no testimony in this case about the defendant's intelligence quotient or the age level at which he functioned. There was no testimony, either lay or expert, showing any abnormal behavior on the part of the defendant. The trial judge had before him the medical report, the testimony of the officers and the testimony of the defendant. The judge had ample opportunity to observe the defendant during the trial, heard his testimony on motion to suppress the confession and again heard his testimony before the jury. The defendant gave sensible answers to questions propounded to him and from the record there is no indication that he had any problem understanding questions or giving sensible answers. The confession was properly admitted on the question of whether the defendant understood his waiver of his constitutional rights. Hancock v. State, 299 So.2d 188 (Miss. 1974).
The next question[1] about the confession is whether a confession made after custodial interrogation following proper Miranda warnings is admissible when an accused had been subjected to a previous custodial interrogation where he was not given proper Miranda warnings.
Defendant was arrested about 8:00 a.m. on January 23, 1975 and questioned briefly concerning his connection with the murder without being given Miranda warnings. No inculpatory information was elicited from him during this questioning. Following a lapse of several hours he was questioned again beginning at 3:00 p.m. He was given proper Miranda warnings and following this questioning, signed a written statement confessing the murder.
The United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), established the requirement that police officers must advise an accused of his constitutional rights prior to any custodial interrogation. Any information *309 gained from questioning before advising an accused of his Miranda warnings is inadmissible at trial. One of the cases considered in Miranda was Westover v. United States, 384 U.S. at 494, 86 S.Ct. at 1638, 16 L.Ed.2d at 735 (1966). In Westover, the Court held that questioning of an accused by police officers without informing him of his constitutional rights rendered a subsequent confession to FBI agents of two other crimes invalid, even though the accused was advised of his constitutional rights by the FBI before making the confession. The Court in Westover felt that "the federal authorities were beneficiaries of the pressure applied by local in-custody interrogation" conducted without adequate warning to the accused of his constitutional rights before the interrogation by the police.
Westover was summarized in Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) by the Court as follows:
In Westover, the petitioner was arrested by the Kansas City police at 9:45 p.m. and taken to the police station. Without giving any advisory warnings of any kind to Westover, the police questioned him that night and throughout the next morning about various local robberies. At noon, three FBI agents took over, gave advisory warnings to Westover, and proceeded to question him about two California bank robberies. After two hours of questioning, the petitioner confessed to the California crimes. The Court held that the confession obtained by the FBI was inadmissible because the interrogation leading to the petitioner's statement followed on the heels of prolonged questioning that was commenced and continued by the Kansas City police without preliminary warnings to Westover of any kind. The Court found that `the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation' and that the belated warnings given by the federal officers were `not sufficient to protect' Westover because from his point of view `the warnings came at the end of the interrogation process.' 384 U.S. at 496-497, 86 S.Ct. at 1639. (423 U.S. at 106, 96 S.Ct. at 327, 46 L.Ed.2d at 322-323).
In the present case although the defendant was questioned briefly following his arrest he made no inculpatory statement whatever. It was not until several hours later that the officers returned for the purpose of conducting a formal interrogation of the defendant. At this time, before the interrogation, the defendant was warned as required by Miranda and signed a waiver of his right to remain silent and to have an attorney present. The circumstances in this case are entirely different from those in Westover. The brief questioning of defendant following his arrest, produced no inculpatory information and in no way resembled the "pressure applied by the local in-custody interrogation" condemned in Westover. It did not preclude a later interrogation by the officers after the defendant's Miranda rights had been explained to him and had been waived.
In Michigan v. Mosley, supra, the respondent was arrested as a suspect in certain robberies and made oral and written acknowledgment of Miranda warnings but declined to discuss the robbery, whereupon the officers ceased the interrogation. More than two hours later, after giving Miranda warnings, another officer questioned respondent about an unrelated murder. Respondent gave inculpatory statements which were used in his trial resulting in his conviction. The Michigan appellate court reversed on the ground that Miranda mandated a cessation of all interrogations after respondent had declined to answer the first officer's questions. However, the Supreme Court disagreed with the Michigan Court and held that the admission of respondent's inculpatory statement in evidence did not violate Miranda. Respondent's right to cut off questioning was honored, the police having immediately ceased the interrogations about the robbery after respondent's refusal to answer and having commenced questioning about the murder after a significant time lapse and after an additional warning had been given.
*310 The United States Supreme Court, in its opinion, after setting forth the requirements of Miranda that interrogations must cease, stated:
This passage states that `the interrogation must cease' when the person in custody indicates that `he wishes to remain silent.' It does not state under what circumstances, if any, a resumption of questioning is permissible. The passage could be literally read to mean that a person who has invoked his `right to silence' can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize `any statement taken after the person invokes his privilege' as `the product of compulsion' and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.
It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent. (423 U.S. at 101-103, 96 S.Ct. at 325-326, 46 L.Ed.2d at 320-321).
Our case is akin to Mosley in that both cases turn on whether Miranda creates a per se proscription of indefinite duration of further interrogation of a person in custody. In Mosley the question involved one who had expressed a desire to remain silent, while our case involves a confession obtained at a second custodial interrogation preceded by a proper Miranda warning following a previous custodial interrogation at which the accused was not advised of his constitutional rights as set forth in Miranda and where no inculpatory statements were obtained.
The Supreme Court of Louisiana considered this precise question in State v. Crothers, 278 So.2d 12 (La. 1973), cert. den. 414 U.S. 1096, 94 S.Ct. 731, 38 L.Ed.2d 558 (1973) and stated:
The exclusionary rule announced in Miranda applies only where custodial interrogation produces some response to the defendant and the State seeks to introduce that response into evidence at the trial of the defendant. Miranda simply does not apply where there is custodial interrogation of the defendant and the responses obtained are not introduced in evidence by the State at the trial; Miranda formulated a rule designed to exclude evidence, but not to void convictions where fruitless custodial interrogation occurs in the absence of prior warnings.
In the instant case when the defendant was questioned at the house by the Constable without prior Miranda warnings he gave no response which was sought to be introduced at trial by the State. Therefore, Miranda could not be invoked because there was no confession or admission, which resulted from the questioning at the house, to exclude. We would certainly view the matter differently had the Constable actually allowed a confession or any other statement at the house, without giving the warnings, and then sought to cure the defective confession or *311 statement by advising the defendant of the Miranda warnings and securing another confession or statement. (278 So.2d at 16).
In our case, when the defendant was questioned by the officers for about 30 minutes following his arrest without prior Miranda warnings, he made no inculpatory statements and none of his responses were sought to be introduced at his trial by the state. We are of the opinion that Miranda could not be invoked because there was no confession or admission to exclude which resulted from his first interrogation.
We took a different view in Brunson v. State, 264 So.2d 817 (1972)[2] where an officer obtained a confession without giving the Miranda warning, and then sought to cure the defective confession by giving the Miranda warning and securing another confession. We held that Brunson's second confession was not admissible.
We agree with the holding in Crothers; Miranda did not formulate a rule to exclude a confession obtained under the facts in this case.
AFFIRMED.
GILLESPIE, C.J., INZER, P.J., and SMITH, ROBERTSON, WALKER, BROOM and LEE, JJ., concur.
PATTERSON, P.J., GILLESPIE, C.J., INZER, P.J., and SMITH, J., specially concur.
PATTERSON, Presiding Justice, specially concurring:
I concur in the result of the majority opinion. I do so because there is no evidence this mentally retarded and youthful appellant was incarcerated and isolated so that incriminating facts could be garnered during the time of incarceration, but prior to the Miranda warning, so that it could be used as a device to induce the confession after the warning was given. The placing of an accused in unfamiliar surroundings without friend or attorney and without knowledge of his constitutional rights produces a situation that could be calculated to produce a confession as surely as physical abuse.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it is stated:
Again we stress that the modern practice of in-custody interrogation is psychologically rather than physically oriented. As we have stated before, "Since Chambers v. Florida, 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." ...
(384 U.S. at 448, 86 S.Ct. at 1614, 16 L.Ed.2d at 708-709).
Because there is nothing to indicate a deliberate design to induce an unconstitutional confession I do not dissent. I concur, however, without relying upon State v. Crothers, 278 So.2d 12 (La. 1973), since I do not think it has application to the present circumstances inasmuch as it is addressed to the absence of statements taken during the period after arrest but prior to warning. I think this overlooks the premise that psychological coercion calculated to induce a confession is incapable of introduction into evidence. The opening pages of Miranda, supra, are enlightening on this point.
In sum, it is my opinion that better police practice requires the Miranda warning to be given at the time of first restraint of an accused and that recurrences of failure to warn will ultimately force the conclusion that unconstitutional advantage is gained by neglecting the warning which will eventually require reversal.
GILLESPIE, C.J., INZER, P.J., and SMITH, J., join in this opinion.
NOTES
[1] This question should never have arisen and would not if the officers had taken a few minutes to advise defendant of his constitutional rights following the simple procedure set forth in Miranda.
[2] compare Oregon v. Mathiason, ___ U.S. ___, 97 S.Ct. 711, 50 L.Ed.2d 714, decided by the United States Supreme Court January 25, 1977.